Rosina Di Orio, et al. ⎫
          vs.          ⎬ No. 1329.
Salvatore Cenci, et al. ⎭

July 5, 1933.

CAPOTOSTO, J. Appeal from the probate of the will of Elviro Cenci, who died at the State Hospital November 2, 1931.

The jury, an unusually good one, in addition to a general verdict against the will, specifically found that the testator was not of sound mind and that the instrument in question was the product of undue influence. The appellees move for a new trial, claiming that the verdict is against the evidence.

The present will, dated December 30, 1929, was the fourth will since 1925 which the testator had executed. Elviro Cenci had seven children, four boys and three girls, all alive at the date of the will. It leaves five dollars to each of the three girls, the youngest of whom is now a patient at Wallum Lake; it gives all the real estate, including household furniture, to his son, Salvatore; and it devises all monies, stocks and bonds in equal shares to the other three sons. Salvatore and Vincent are named as co-executors. The estate consists of some $14,000 in cash and securities, two three-tenement houses with garages, and three vacant lots. The real estate, at present day values, is worth conservatively $9000 or more.

The testator's wife died in 1914 or 1915. He never re-married. All the children continued to live with the father after their mother's death. The oldest girl, Rosina, now Mrs. Di Orio, took care of the house until she married in 1924. Then Amelia, the present Mrs. Passarelli, took charge until November 1927, when she left due to alleged mistreatment. She married in June 1928. Bernice, the youngest girl, continued to live at home until January 1930, when in consequence of her father's conduct, as she states, she went to live with her sister Amelia. In February 1932, she became a patient at Wallum Lake. Of the boys, Vincent attended Brown University, then went to a dental school in Boston, and is now resident dentist at the State Hospital. Salvatore never left home. He married in June 1929 and continued to live in the same place. George died in January 1930. Domenic left home, joined the navy and is in the service now.

All four wills of Elviro Cenci were executed in the office of Mr. William B. Greenough. In each instance the testator took charge of the original, while Mr. Greenough retained a copy. The first will of the testator, executed in March 1925, gave Rosina $100, and then created a trust for all his other children. Ultimately, it gave one-tenth of his estate to Rosina and one-tenth to Bernice, one-fifth to each of the four boys, and a contingent gift to Brown University for the assistance of needy students. This last provision was probably in grateful recognition of what Brown had done for his son Vincent.

The second will, executed November 16, 1927, gave five dollars to each of the three girls, cut out any contingent gift to Brown University, and created a trust for the benefit of the four boys.

The third will, dated November 1, 1929, is similar to the will of 1927, except that it eliminates the trust and gives all the property outright to the boys.

The fourth will, the one in issue, dated December 30, 1929, is an exact copy of the third will executed November 1, 1929.

The first will of 1925 was destroyed in the office of Mr. Greenough when the second will was executed. What became of the second will is unknown. The testator claimed to have lost the third will. This brings us to the circumstances immediately surrounding the execution of the fourth will, which is the subject of inquiry here. The substance of Mr. Greenough's testimony, the only attesting witness produced at the trial, was that the testator told him that he had lost the will which he had executed a short time before and that he wanted to sign another will exactly like it; that no details were discussed as it was simply a matter of making a copy; that the deceased, who seemed to be in a hurry, made no statement as to how he had lost the will but did seem troubled over the fact that he had done so. The witness further stated that, other than an indistinct recollection of some statement by the testator in 1927 about changed conditions at home, he knew nothing of his personal habits or home life, and that his opinion of soundness of mind was based solely upon what he saw of the testator in his office.

The appellants claimed that about 1927 a decided change occurred in the testator's condition. They said that he gradually became more and more unreasonable in his attitude and conduct towards them, always complaining, ever exacting and not infrequently violent. From this time on, the appellants say that he began to indulge excessively in the use of wine to the extent of requiring medical attention, which he disregarded; that this condition continued up to September 27, 1930, when he was arrested for an assault with a razor upon Edna Cenci, wife of Salvatore, with whom the testator continued to live after Mrs. Passarelli and Bernice were obliged to leave home because of the father's unreasonable, unfair and violent attitude. The appellees denied any excessive drinking, and claimed that if the girls left it was of their own volition in order to secure greater freedom from parental control.

This period is of importance both as to what actually happened and as we see it reflected in the conduct of Salvatore and Vincent from the time of the testator's arrest until his death. In the spring of 1927, the testator, according to Mrs. Passarelli, said on several occasions that he was going to do something to himself and also take some one else along with him. On May 15, 1927, he shot and seriously wounded himself. That same day he was admitted to the Rhode Island Hospital and remained there until June 4. The

hospital record shows that the patient gave as a reason for his act "a funny" feeling in his head all that morning and home trouble.

In the late summer of that same year the testator consulted Dr. William F. Sullivan, who advised him at various times between August 1927 and May 1929. He never knew from his patient that he had attempted to take his life. Dr. Sullivan testified that at the very first visit he found the testator a chronic alcoholic; that he apparently did not follow his advice, and that he was always in a state of chronic alcoholism, so much so that at one time he warned Salvatore that if his father did not change his ways it would become a serious matter for him. He further said that he was not surprised at the fact that the testator tried to kill himself because an alcoholic with a chronic saturated brain may, at any time, do violence to himself or to others. This last observation is important in view of what occurred in September 1930. Dr. Sullivan's testimony was based upon personal observation, it was unequivocal and convincing. In the Court's opinion it was not weakened in the least by the negative testimony of friends of the deceased to the effect that the testator did not drink to excess.

The next mental explosion evidenced by an outward act occurred on September 27, 1930, when the testator assaulted Salvatore's wife with a razor, inflicting a serious wound on her right cheek. He was arrested and imprisoned that same day. In due course of time, after an examination by a physician made simply to determine his criminal responsibility, he was transferred to the Hospital for Mental Diseases, where he remained until his death.

In their attempts to disprove this phase of the case, the appellees urge that the testator was affected with paranoia and that a chronic alcoholic brain was neither an existing or a concurring element. Two distinguished alienists were called upon for their opinions. The methods which each used in dealing with this subject are diametrically opposed and interesting to the point of inviting comparison. One was reserved and self-protecting in his statement; the other was most generous in his conclusions in favor of the appellees. The substance of their testimony is, however, clear. Both agreed that paranoia is a mental disorder and not a physical deterioration of the mind; that it consists of delusions, a false belief based upon perverted reasoning; that it runs in circles varying as to scope from time to time, and including the same, more or entirely different persons at any given period. Both, moreover, admitted that alcoholism and paranoia may be coexistent. The first expert restricted his positive testimony to mental infirmity with reference to criminal responsibilities. As to the condition of mind at other times, he left his hearers a free choice from his qualifications, suppositions and assumptions. The second expert showed a more partisan attitude. He sought to convey the idea that the testator had not been an alcoholic; that the paranoia could not have existed for any length of time, and that the field of testator's delusions included only the daughter-in-law, Edna. The record, of course, gives the full details. Keeping in mind the testimony of Dr. Sullivan, if we add to it the history of fixed events, the conservative evidence of the first expert and a reasonable valuation of the statements of the second, we are drawn forcibly to the conclusion that from early 1927 the mind of the testator was in an unnatural condition, subject to sudden volcanic eruption. The gentlemen of the medical profession may quarrel to their hearts' content as to

terminology and classification of ailments, but the fact remains that starting from 1927 the testator was not the same man mentally and physically that he had been before that time.

The changes in the wills after 1925 and the concentration of benefits thereunder are worthy of consideration. The girls are barely remembered and Brown University is entirely forgotten, while both authority and property gradually shift to Salvatore and Vincent. Protective restrictions in the form of trusts are removed and replaced by specific devises which are to take effect immediately upon the testator's death.

The conduct of the two boys, especially Salvatore's, after September 1930, the date of the testator's arrest, demands scrutiny. Although it is after the making of the will in question, yet their general attitude reflects considerable light upon previous events, whether testified to in words or left in the hazy realm of inference. No sooner was the father arrested than Edna has a writ of arrest for $20,000 issued against him. Salvatore gets busy and immediately applies for the appointment of a guardian; he visits the safe deposit box and reads the will; he draws, signs and cashes a substantial check without his father's knowledge, and he incurs liberal attorney's fees for services which are directed more to his father's restraint than to his comfort or freedom. The net result of it all is that the testator is shut up in a hospital for mental diseases and that Salvatore comes into complete control of all the real estate. His attitude even in court lacked balance and reserve. He gave the impression of one who got what he wanted and was going to keep what he had received. Vincent, while more conservative, showed himself a confidant of Salvatore by his generous use of the funds of the estate for their common advantage. To pick out specific instances in detail will distort the picture as a whole. While others may possibly disagree, this Court feels that the two boys showed a lack of natural affection for their three sisters, especially the unfortunate Bernice; that from September 1930 the father's estate rather than his welfare became their prime concern, and that from that time on both paid more attention to family strife than to the distressing circumstances surrounding them.

As already stated, the will in question was executed in the office of Mr. William B. Greenough. Out of extreme caution, the Court of its own motion submitted two special findings for determination by the jury: one, as to soundness of mind; the other, as to undue influence. Both issues were decided against the appellees.

This Court entertains and does not hesitate to express the highest respect for Mr. Greenough. His reputation radiates confidence. But Mr. Greenough is an impartial witness. In his courteous and unique way he made it absolutely clear that he knew nothing of the habits, family life, misfortune and aberrations of his former client. With this frank statement before it, the jury was justified to search the evidence of other witnesses both as to the testator's mental condition and as to his home life. Its conclusion was against the will. The testimony may be susceptible of different interpretations. Mere disagreement with a jury's finding under such circumstances does not militate against the verdict. In this particular case, however, the Court feels just as the jury did, namely, that the will in question is not the will of Elviro Cenci.

Motion for new trial denied.

For appellants: Charles A. Kiernan, Esq.

For appellees: Jonas Sallet.